**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

| | | |
|---|---|---|
| RONALD D. BOSCHAN, individually and derivatively on behalf of SHILDAN, INC., | : : : | Civil Action |
| | : | No. 19-cv-6481 |
| Plaintiff, | : : | |
| v. | : : | |
| | : | **COMPLAINT** |
| MOSHE STEINMETZ, | : : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

_____:

Plaintiff Ronald D. Boschan ("Boschan"), through his undersigned attorneys, both individually on his own behalf and derivatively on behalf of Shildan, Inc. ("Shildan"), states the following as and for his Complaint against Defendant Moshe Steinmetz:

<u>**NATURE OF ACTION**</u>

1.     Boschan, a minority shareholder in Shildan, commences this action against defendant Moshe Steinmetz ("Steinmetz"), the President, CEO, Chairman and majority shareholder of Shildan.

2.     Steinmetz has breached his fiduciary duties to Boschan and to Shildan. Steinmetz has wasted corporate assets by distributing or otherwise transferring such assets to himself and his family, all in order to artificially devalue the company and reduce the share of distributions owed to Boschan.  And Steinmetz has unjustly enriched himself at the expense of both Boschan and Shildan.

3.     Boschan seeks compensatory damages, punitive damages, interest, and costs on both his own behalf and on behalf of Shildan, in order to compensate Boschan and Shildan for the harms and losses they have suffered as a result of Steinmetz's unlawful actions.

**THE PARTIES**

4.      Plaintiff Boschan is an adult individual who resides at 2429 Locust Street, #507, Philadelphia, Pennsylvania.  Boschan is the 30% owner of Shildan, a corporation organized and existing under the laws of the State of New York.   Shildan engages in the business of selling terra cotta facades for commercial, institutional, and high rise residential construction projects.  Prior to January 17, 2018, Boschan was an employee of Shildan.

5.      Defendant Steinmetz is an adult individual who is a citizen of Israel.  Upon information and belief, Steinmetz resides at 210 HaRimon Street, Moshav Ge'Alya, Israel, 76885.  When in the United States, Steinmetz resides in Mount Laurel, New Jersey.  Steinmetz, or a family trust under his control, owns a home in Port Washington, New York that he rents out for financial gain.

6.      Steinmetz is the President, CEO, Chairman of the Board, and 70% owner of Shildan.  Steinmetz, or a family trust under his control, is also the sole or majority owner of 2047 Briggs Road, LLC and Woodlane 1309 Associates, LLC, both of which own real estate in the State of New Jersey.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) & (2) because diversity of citizenship exists between Plaintiff and Defendant.  Plaintiff Boschan is a citizen of the Commonwealth of Pennsylvania, and Defendant Steinmetz is a citizen of Israel who resides in the State of New Jersey when in the United States.  As discussed above, Shildan is a corporation organized and existing under the laws of the State of New York.

8.      This Court has personal jurisdiction over Steinmetz because he has purposefully availed himself of the laws and benefits of this state by, among other things,

23111212v.1

incorporating Shildan under New York law, regularly conducting Shildan's business in New York, and renting out a home in New York for profit.

9.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) & (3) because a substantial portion of the acts underlying Boschan's claims occurred here and because Steinmetz, who is not a resident of the United States,  is subject to the Court's personal jurisdiction and may properly be sued in this district.

## **FACTUAL BACKGROUND**

10.      This action arises out of Steinmetz's systematic use of Shildan's funds for his own use and benefit and to the detriment of Boschan, the minority shareholder in Shildan. Rather than use Shildan's funds for the benefit of the corporation and make distributions in an equitable manner, Steinmetz has taken money from the corporation for his own benefit by, among other things, making distributions on an inequitable basis, causing Shildan to enter into real estate leases with companies owned or controlled by Steinmetz for amounts far in excess of fair rental value, paying himself a salary far in excess of the amounts paid to executives in similarly sized companies, paying himself but not Boschan commissions on sales, causing Shildan to loan him money on less than arm's length terms, paying personal and family expenses from company funds, causing Shildan to pay a salary and/or consulting fees to his family and friends, even though they did not legitimately work for or do work for the company, and causing Shildan to buy a whole life insurance policy for the benefit of himself and his family and not Shildan.  Steinmetz's actions have caused Boschan to sustain damages in an amount estimated to be in excess of $1 million, and have caused Shildan to sustain damages in an amount estimated to be in excess of $3 million.

**Steinmetz's Incorporation and Control of Shildan**

11.     Steinmetz incorporated Shildan, Inc. on August 5, 1998 under the laws of the State of New York.  Steinmetz created Shildan to sell, among other things, terra cotta facades to construction managers, general contractors, and subcontractors throughout the United States.

12.     Upon information and belief, at the time of incorporation, Steinmetz was President and CEO of Shildan, the Chairman of Shildan's Board of Directors, and one of four shareholders.  Steinmetz became Shildan's majority shareholder in 1999.

13.     Shildan was originally formed as a C-corporation, but in approximately 2013, Steinmetz converted it to an S-corporation.

14.     Though the exact percentage of Shildan that Steinmetz owns has changed since the company's incorporation, since 2014 Steinmetz has owned 70% of Shildan.

**Boschan's Experience in the Industry and Involvement with Shildan**

15.     Boschan has been in the business of selling building facades for over 35 years.  He has extensive knowledge of the industry and a wide-ranging network of valuable contacts within the industry.

16.     Boschan and Steinmetz first met in 1998, when Shildan was just beginning operations and Boschan owned his own building façade business.  Steinmetz quickly recognized the value of Boschan's expertise and connections within the industry, and the two initially discussed representation of Shildan in the northeastern United States by Boschan's company, Architectural Facades, Inc. ("AFI").  After AFI proved successful in marketing and selling Shildan's terra cotta products over the course of the next several years, Steinmetz and Boschan discussed a possible merger of their respective companies.  Though those merger discussions never

came to fruition, Boschan introduced Steinmetz to many of the building façade installers who would later contribute to Shildan's success.

17.     In 2004, after Boschan's prior company became inactive, Steinmetz offered Boschan a job as Shildan's national sales manager.  To induce Boschan into taking this position, Steinmetz offered Boschan the option to later receive 30% of Shildan's stock.  Boschan agreed to accept the position.

18.     Boschan's extensive experience in the sales of building facades enabled him to become a successful salesman and sales manager for Shildan, and created substantial income for Shildan and Steinmetz.  Steinmetz shifted additional responsibilities to Boschan over time, allowing Steinmetz to move to Israel.

19.     On August 1, 2011, Boschan officially became a 30% shareholder in Shildan, Inc.  Steinmetz owned the remaining 70% of the company at that time, either individually or in combination with his wife.  Eventually, Steinmetz's wife surrendered her shares, leaving Steinmetz as 70% owner and Boschan as 30% owner of the corporation.

**Steinmetz and Boschan's Oral Agreement Regarding Compensation**

20.     At or around the time Boschan was hired by Shildan in 2004, Boschan and Steinmetz orally agreed that both would receive an identical salary and that neither would receive any commission on sales.  Their salaries began at $60,000.00 and rose steadily over time, eventually increasing to $150,000.00 in or around 2011.

21.     When Boschan became a shareholder in 2011, he and Steinmetz orally agreed that they would each receive distributions several times a year based on their pro rata ownership of the corporation.  Boschan and Steinmetz also reaffirmed their earlier agreement that

neither would receive a commission, or any other compensation from Shildan, beyond the agreed upon identical salaries and pro rata distribution of profits.

**Steinmetz Pressures Boschan to Resign**

22.     In or about the fall of 2016, Boschan began considering retiring from Shildan, Inc. and selling his shares in the corporation to Steinmetz.

23.     Steinmetz initially made an offer to Boschan to purchase Boschan's shares (an offer well below the market value of those shares based upon an appraisal of the company that Shildan had commissioned around that time), but Steinmetz shortly thereafter withdrew his offer.

24.     Steinmetz then embarked on a campaign to pressure Boschan into resigning from the company.

25.     Steinmetz deliberately humiliated Boschan in meetings with subordinate staff.

26.     Steinmetz sent Boschan harassing emails.

27.     Steinmetz forced Boschan to take grueling, meaningless business trips on non-direct, redeye flights.

28.     Steinmetz wrongfully accused Boschan of not working hard for Shildan.

29.     For the first time in Boschan's entire period of employment with Shildan, Steinmetz forced Boschan to keep timesheets and report his comings and goings to Steinmetz.

30.     Steinmetz made business decisions without consulting Boschan or even advising Boschan that he was doing so.

31.     Steinmetz also began to refuse to provide Boschan with company financial information when Boschan requested it, or only provided Boschan with partial financial

information that was patently insufficient to allow Boschan to meaningfully evaluate the company's finances, distribution amounts, and value.

32.     Boschan remained employed by Shildan part time during this period, but later resigned on January 18, 2018.  Boschan resigned at that time as a result of Steinmetz's coercive actions instituted following Steinmetz's withdrawal of the buy-out offer and Boschan's refusal to sell his stock in Shildan to Steinmetz at a grossly deflated price.

**Steinmetz Funnels Money to Himself to the Detriment of Boschan and Shildan**

33.     Following Boschan's resignation, Steinmetz began to pay himself amounts grossly in excess of the $150,000 per year salary that both Steinmetz and Boschan agreed to receive as employees and shareholders.  In 2018, for instance, Steinmetz caused Shildan to pay him $715,000 in salary, an amount far in excess of the fair and reasonable compensation being paid to presidents and CEOs of similarly sized businesses.  Moreover, Steinmetz, who spends most of the year in Israel, is not in the position to adequately serve as the leader of the day-to-day operations of Shildan, which operates only in the United States.

34.     Steinmetz's payment of excessive salary to himself constitutes improper self-dealing, violates the oral agreement in place between Steinmetz and Boschan, and represents an improper attempt by Steinmetz to deprive Boschan of his equitable share of distributions by the company.

35.     Moreover, Boschan discovered at or around the time that Steinmetz withdrew his initial buyout offer that Steinmetz had, for years, been wasting corporate assets and funneling money to himself in order to reduce Shildan's value and thus the amount of profits distributed to Boschan.

23111212v.1

36.     For instance, as President, CEO, Chairman, and majority shareholder of Shildan, Steinmetz systematically removed cash from the corporation by leasing real estate from companies Steinmetz owned and/or controlled to Shildan for amounts substantially in excess of fair rental value.

37.     In or about 2011-2012, Steinmetz purchased a building located at 2047 Briggs Road, Mount Laurel, New Jersey (the "2047 Briggs Road Property") through a New Jersey limited liability company known as 2047 Briggs Road, LLC.

38.     The building located on the 2047 Briggs Road Property was a dilapidated, metal machine shop with a small office, which was approximately 40 years old.  The building contained only approximately 800 square feet of office space.  The remainder of the building was old warehouse space with low ceilings.

39.     After purchasing the 2047 Briggs Road Property, Steinmetz as President and CEO of Shildan, Inc. (i.e., the tenant) and as the Managing Member of 2047 Briggs Road, LLC (i.e., the landlord) entered into a lease agreement for the 2047 Briggs Road Property (the "2047 Briggs Road Lease").

40.     Under the 2047 Briggs Road Lease, Steinmetz charged Shildan, Inc. rent far in excess of the fair rental value of that property.  Additionally, upon information and belief, Steinmetz charged Shildan, Inc. the costs, or much of the costs, of tenant improvements, thereby further increasing Shildan's already excessive costs of occupying the 2047 Briggs Road Property.

41.     Steinmetz's decision to enter into the 2047 Briggs Road Lease for grossly inflated rental payments and to charge Shildan for tenant improvements was done for Steinmetz's own personal benefit and was contrary to the best interests of Shildan and Steinmetz's fellow shareholder, Boschan.

42.     In late 2013 or early 2014, Steinmetz purchased a lot adjacent to the 2047 Briggs Road Property known as 2043 Briggs Road, Mount Laurel, New Jersey (the "2043 Briggs Road Property").  The 2043 Briggs Road Property contained a small house converted to an office and a small shed built with or containing asbestos.  Steinmetz purchased the 2043 Briggs Road Property through 2047 Briggs Road, LLC.

43.     After purchasing the 2043 Briggs Road Property, Steinmetz as President and CEO of Shildan, Inc. (i.e., the tenant) and as the Managing Member of 2047 Briggs Road, LLC (i.e., the landlord) entered into a lease agreement for the 2047 Briggs Road Property and the 2043 Briggs Road Property (the "2047/2043 Briggs Road Lease").  Thereafter, on August 18, 2017, Steinmetz, acting on behalf of both the landlord and the tenant, entered into an amended lease for the 2047 Briggs Road Property and the 2043 Briggs Road Property (the "Amended 2047/2043 Briggs Road Lease").

44.     Under the 2047/2043 Briggs Road Lease and the Amended 2047/2043 Briggs Road Lease, Shildan, Inc. paid rent far in excess of the fair rental value of that property.

45.     Upon information and belief, Shildan has not used the 2043 Briggs Road Property for any business purpose to date.

46.     Steinmetz's decision to have Shildan, Inc. pay grossly excessive rent under the 2047 Briggs Road Lease, the 2047/2043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease, and to have Shildan pay for tenant improvements, real estate taxes, insurance, maintenance, and utilities for those properties was contrary to Shildan's best interests and those of minority shareholder Boschan.  Rather, it was done solely for Steinmetz's own personal benefit.

47.     By agreeing on behalf of Shildan, Inc. to pay 2047 Briggs Road, LLC's grossly inflated rents and to pay for tenant improvements to the 2047 Briggs Road Property and

the 2043 Briggs Road Property, Steinmetz wasted corporate assets, and effectuated distributions to himself without making any such distributions to Boschan.

48.     On or about March 23, 2018, Steinmetz purchased real estate located at 1309 Woodlane Road, Eastampton, New Jersey (the "1309 Woodlane Road Property") through an entity known as Woodlane 1309 Associates LLC.  The building located on the 1309 Woodlane Property was primarily warehouse space that was in poor condition and in an inconvenient location.

49.     It is unclear what purpose this warehouse space is intended to serve, since Shildan does not maintain significant amounts of inventory requiring warehousing.  To the contrary, Shildan's terra cotta facades and support systems are typically shipped directly from Shildan's supplier to Shildan's customer.

50.     On or about March 23, 2018, Steinmetz also purchased unimproved real estate adjacent to the 1309 Woodlane Road Property known as 1306 Monmouth Road, Eastampton, New Jersey (the "1306 Monmouth Road Property").  Steinmetz also purchased this property through Woodlane 1309 Associates LLC.

51.     Though, according to Steinmetz, he purchased the 1306 Monmouth Road Property "for future use," upon information and belief this property has not to date been used for any business purpose, and nothing has been constructed on the land.

52.     Notwithstanding the poor condition of the 1309 Woodlane Road Property, its inconvenient location for Shildan's business, the lack of any need for additional warehouse space, and the lack of any current need for the 1306 Monmouth Road Property, Steinmetz, acting on behalf of Shildan, Inc. as tenant, entered into a lease for both properties (the "1309 Woodlane

/1306 Monmouth Lease").  Steinmetz also signed the 1309 Woodlane/1306 Monmouth Lease on behalf of the landlord, Woodlane 1309 Associates LLC.

53.     Under the 1309 Woodlane/1306 Monmouth Lease, Steinmetz again caused Shildan, Inc. to pay rent far in excess of the fair rental value of those properties.

54.     Steinmetz's decision to enter into the 1309 Woodlane/1306 Monmouth Lease for grossly inflated rental payments was contrary to the best interests of Shildan, Inc. and minority shareholder Boschan and solely for Steinmetz's own personal benefit.

55.     By agreeing on behalf of Shildan, Inc. to pay Woodlane 1309 Associates' grossly inflated rents and to pay for tenant improvements to the 1309 Woodlane Road Property and the 1306 Monmouth Road Property, Steinmetz wasted corporate assets and effectuated distributions of money from Shildan, Inc. to himself without making any such distributions to Boschan.

56.     Over the life of the 2047 Briggs Road Lease, the 2047/2043 Briggs Road Lease, the Amended 2047/2043 Briggs Road Lease, and the 1309 Woodlane/1306 Monmouth Road Lease, Steinmetz will have distributed to himself substantial amounts of money without having made any pro rata distributions to Boschan.

57.     Steinmetz further effectuated distributions to himself and to the exclusion of Boschan by paying himself a "commission" in 2016, before Boschan's forced resignation, in the amount of $366,000.  This directly violated the terms of Steinmetz and Boschan's oral agreement limiting the forms and amounts of their respective compensation.  At no point in time has Steinmetz ever authorized any commission to be paid to Boschan.

23111212v.1

58. Steinmetz further effectuated distributions to himself by having Shildan, Inc. loan him approximately $460,000.00 at less than arms' length terms. Upon information and belief, Steinmetz has not yet repaid the majority of this loan amount.

59. Steinmetz further made distributions to himself and to the exclusion of Boschan by paying other personal expenses for himself and his family members and friends that were unrelated to Shildan's business, including:

(a) causing Shildan to purchase a whole life insurance policy for Steinmetz worth well in excess of $1,000,000.00, naming his family as the sole beneficiaries;

(b) causing Shildan to pay travel expenses for himself and his family; and

(c) causing Shildan to pay unearned salaries and/or consulting fees to family members and friends, for instance by paying Steinmetz's wife approximately $17,000.00 per year even though his wife does not actually work for Shildan.

60. Upon information and belief, Steinmetz has caused Shildan to issue other improper distributions to himself, and to the exclusion of Boschan.

61. Steinmetz's indiscriminate use of Shildan's funds for reasons unrelated to the corporation's business and solely for the benefit of himself and his family members and friends constitute breaches of his fiduciary duties to minority shareholder Boschan and to Shildan.

**Steinmetz Refuses to Provide Boschan with All Books and Records that Boschan Requests**

62. Steinmetz has refused to provide to Boschan certain requested information regarding Shildan's operations that would enable Boschan to fully monitor those operations and completely assess the extent of Steinmetz's breaches of fiduciary duties to Boschan and the corporation.

63.     Steinmetz's actions have caused Boschan and Shildan to sustain substantial damages. Though Boschan's damages are believed to be in excess of $1 million, and Shildan's damages believed to be in excess of $3 million, Boschan is currently unable to assess these damages with greater precision because of Steinmetz's refusal to provide the complete set of books and records Boschan has repeatedly requested.

## COUNT I
### (Breach of Fiduciary Duties, on Behalf of Boschan Individually)

64.     Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

65.     As the President, CEO, Chairman of the Board, and majority shareholder of Shildan, Inc., Steinmetz owes fiduciary duties to Boschan, which include the obligation to use corporation funds solely for the best interest of the corporation and not for Steinmetz's personal and family reasons.  Steinmetz also has a fiduciary duty to distribute funds to shareholders, including Boschan, in an equitable fashion.

66.     Steinmetz breached his fiduciary duties to Boschan by:

(a)     paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since Boschan has never received a commission for his sales;

(c)     distributing money to himself and to the exclusion of Boschan in the form of rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     distributing money to himself and to the exclusion of Boschan in the form of rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

(e)     distributing money to himself and to the exclusion of Boschan in the form of the payment of the expenses associated with a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)     distributing money to himself and to the exclusion of Boschan in the form of the payment of personal and family expenses;

(g)     distributing money in the form of unearned salaries and/or consulting fees to his family and friends, to the exclusion of Boschan;

(h)     distributing money to himself and to the exclusion of Boschan in the form of less-than-arms-length loans;

(i)     issuing additional improper distributions to himself, and to the exclusion of Boschan, upon information and belief;

(j)     failing to make distributions to Boschan;

(k)     attempting to drive Boschan from Shildan, Inc. and force him to sell his 30% ownership in the corporation for less than fair value; and

(l)     depriving Boschan of fundamental information and documents that he needs to be informed of the rationale for Steinmetz's decisions and actions, and to enable Boschan to meaningfully monitor whether Steinmetz is complying with his fiduciary duties.

67.     As a direct and proximate result of Steinmetz's breaches of fiduciary duties, Boschan has sustained damages in an amount yet to be determined but believed to be in excess of $1 million.

68.     Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or grossly negligent as to warrant the imposition of punitive damages.

## COUNT II
### (Breach of Fiduciary Duties, Derivatively on Behalf of Shildan)

69.     Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

70.     As the President, CEO, Chairman of the Board, and majority shareholder of Shildan, Inc., Steinmetz owes fiduciary duties to Shildan, which include the obligation to use corporation funds solely for the best interest of the corporation and not for Steinmetz's personal and family reasons.  Steinmetz also has a fiduciary duty to distribute funds to shareholders in an equitable fashion.

71.     Steinmetz breached his fiduciary duties to Shildan by:

(a)     paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since other shareholders never received a commission for sales;

(c)     causing Shildan to make rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     causing Shildan to make rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

(e)     causing Shildan to purchase a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)     causing Shildan to distribute money to himself for personal and family expenses unrelated to Shildan's business;

(g)     causing Shildan to distribute money in the form of unearned salaries and/or consulting fees to his family and friends;

(h)     causing Shildan to loan money to him on less-than-arms-length terms;

(i)     causing Shildan to issue additional improper distributions to himself, upon information and belief; and

(j)     depriving Boschan of fundamental information and documents that he needs to be informed of the rationale for Steinmetz's decisions and actions, and to enable Boschan to meaningfully monitor whether Steinmetz is complying with his fiduciary duties.

72.     As a direct and proximate result of Steinmetz's breaches of fiduciary duties, Shildan has sustained damages in an amount yet to be determined but believed to be in excess of $3 million.

73.     Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or grossly negligent as to warrant the imposition of punitive damages.

74.     As Steinmetz controls a 70% ownership interest in Shildan, Boschan has not made a formal demand for action to Shildan because such a demand would have been entirely futile.

23111212v.1

## COUNT III
### (Corporate Waste, on Behalf of Boschan Individually)

75.     Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

76.     As the President, CEO, Chairman of the Board, and majority shareholder of Shildan, Inc., Steinmetz owes a duty to Boschan, as a Shildan shareholder, not to waste the assets of the corporation.

77.     Steinmetz breached this duty and wasted Shildan's corporate assets by:

(a)     paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since other shareholders never received a commission for sales;

(c)     causing Shildan to make rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     causing Shildan to make rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

(e)     causing Shildan to purchase a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)     causing Shildan to distribute money to himself for personal and family expenses unrelated to Shildan's business;

-17-

(g)      causing Shildan to distribute money in the form of unearned salaries and/or consulting fees to his family and friends, to the exclusion of Boschan;

(h)      causing Shildan to loan money to himself on less-than-arms-length terms; and

(i)      causing Shildan to issue additional improper distributions to himself, upon information and belief.

78.      No reasonable businessperson could conclude that Shildan received a fair benefit for these expenditures.

79.      As a direct and proximate result of Steinmetz's waste of corporate assets, Boschan has sustained damages in an amount yet to be determined but believed to be in excess of $1 million.

80.      Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or gross negligent as to warrant the imposition of punitive damages.

## COUNT IV
### (Corporate Waste, Derivatively on Behalf of Shildan)

81.      Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

82.      As the President, CEO, Chairman of the Board, and majority shareholder of Shildan, Inc., Steinmetz owes a duty to Shildan not to waste the corporation's assets.

83.      Steinmetz wasted Shildan's corporate assets by:

(a)      paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since other shareholders never received a commission for sales;

(c)     causing Shildan to make rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     causing Shildan to make rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

(e)     causing Shildan to purchase a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)     causing Shildan to distribute money to himself for personal and family expenses unrelated to Shildan's business; and

(g)     causing Shildan to distribute money in the form of unearned salaries and/or consulting fees to his family and friends;

(h)     causing Shildan to loan money to himself on less-than-arms-length terms; and

(i)     causing Shildan to issue additional improper distributions to himself, upon information and belief.

84.     No reasonable businessperson could conclude that Shildan received a fair benefit for these expenditures.

85.     As a direct and proximate result of Steinmetz's waste of corporate assets, Shildan has sustained damages in an amount yet to be determined but believed to be in excess of $3 million.

86.     Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or grossly negligent as to warrant the imposition of punitive damages.

87.     As Steinmetz controls a 70% ownership interest in Shildan, Boschan has not made a formal demand for action to Shildan because such a demand would have been entirely futile.

## COUNT V
### (Unjust Enrichment, on Behalf of Boschan Individually)

88.     Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

89.     Steinmetz has been unjustly enriched at Boschan's expense through Steinmetz's unlawful, improper behavior and self-dealing described above.

90.     Specifically, Steinmetz was unjustly enriched at Boschan's expense by:

(a)     paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since Boschan has never received a commission for his sales;

(c)     distributing money to himself and to the exclusion of Boschan in the form of rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     distributing money to himself and to the exclusion of Boschan in the form of rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

-20-

(e)      distributing money to himself and to the exclusion of Boschan in the form of the payment of the expenses associated with a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)      distributing money to himself and to the exclusion of Boschan in the form of the payment of personal and family expenses;

(g)      distributing money in the form of unearned salaries and/or consulting fees to his family and friends, to the exclusion of Boschan;

(h)      distributing money to himself and to the exclusion of Boshan in the form of less-than-arms-length loans;

(i)      issuing additional improper distributions to himself, and to the exclusion of Boschan, upon information and belief; and

(j)      failing to make distributions to Boschan.

91.      As a direct and proximate result of Steinmetz's unjust enrichment, Boschan has sustained damages in an amount yet to be determined but believed to be in excess of $1 million.

92.      Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or gross negligent as to warrant the imposition of punitive damages.

### COUNT VI
### (Unjust Enrichment, Derivatively on Behalf of Shildan)

93.      Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

94.      Steinmetz has been unjustly enriched at Shildan's expense through Steinmetz's unlawful, improper behavior and self-dealing described above.

95.      Specifically, Steinmetz was unjustly enriched at Shildan's expense by:

(a)     paying himself a $715,000/year salary, which amount is well in excess of the amount of $150,000 previously agreed to by Steinmetz and Boschan and well in excess of the amount being paid to presidents and CEOs of similarly sized companies;

(b)     paying himself a "commission" in the amount of $366,000, which is contrary to the company's practice and inherently inequitable since other shareholders never received a commission for sales;

(c)     causing Shildan to make rental payments far in excess of fair rental value under the 2047 Briggs Road Lease, the 2047/2 043 Briggs Road Lease, and the Amended 2047/2043 Briggs Road Lease;

(d)     causing Shildan to make rental payments far in excess of fair rental value under the 1309 Woodlane/1306 Monmouth Lease;

(e)     causing Shildan to purchase a whole life insurance policy on which Steinmetz's family is the sole beneficiary;

(f)     causing Shildan to distribute money to himself for personal and family expenses unrelated to Shildan's business;

(g)     causing Shildan to distribute money in the form of unearned salaries and/or consulting fees to his family and friends;

(h)     causing Shildan to loan money to himself on less-than-arms-length terms; and

(i)     causing Shildan to issue additional improper distributions to himself, upon information and belief.

96.     No reasonable businessperson could conclude that Shildan received a fair benefit for these expenditures.

97.     As a direct and proximate result of Steinmetz's unjust enrichment, Shildan has sustained damages in an amount yet to be determined but believed to be in excess of $3 million.

98.     Steinmetz's actions are so outrageous, intentional, deliberate, reckless, wanton, and/or grossly negligent as to warrant the imposition of punitive damages.

99.     As Steinmetz controls a 70% ownership interest in Shildan, Boschan has not made a formal demand for action to Shildan because such a demand would have been entirely futile.

### COUNT VII
### (Breach of Contract, on Behalf of Boschan Individually)

100.    Boschan repeats and realleges each and every allegation above as though they were fully set forth herein at length.

101.    At or around the time Boschan was hired by Shildan in 2004, Boschan and Steinmetz orally agreed to receive an identical salary, and that neither would receive any commission on sales.

102.    When Boschan became a shareholder in 2011, he and Steinmetz orally agreed that they would each receive distributions several times a year based on their pro rata ownership of the corporation. Boschan and Steinmetz also reaffirmed their earlier agreement that neither would receive a commission, or any other compensation from Shildan, beyond the agreed upon identical salaries and pro rata distribution of profits.

103.    Boschan and Steinmetz's oral agreement constitutes an enforceable contract.

104.    Steinmetz breached the terms of the parties' contract by issuing or causing Shildan to issue purported "commissions" to himself. Such "commissions" include a purported "commission" issued to Steinmetz in 2016 for $366,000.

105.    As a direct and proximate result of Steinmetz's breach of contract, Boschan has sustained damages in an amount yet to be determined but believed to be in excess of $1 million.

## JURY TRIAL DEMANDED

106.    Boschan respectfully demands a jury trial.

## RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, Boschan demands judgment against Steinmetz as follows:

1.  Awarding Boschan compensatory damages in excess of $150,000, prejudgment interest, post-judgment interest, costs, attorneys' fees, punitive damages, and such further relief as this Court deems to be just and proper.

2.  Awarding Shildan compensatory damages in excess of $150,000, prejudgment interest, post-judgment interest, costs, attorneys' fees, punitive damages, and such further relief as this Court deems to be just and proper.

3.  All other and further relief as the Court may deem just and appropriate.

Dated: July 12, 2019                    By:    _____/s/_____
      New York, New York                    Eric Porter
                                        WHITE AND WILLIAMS LLP
                                        7 Times Square, Suite 2900
                                        New York, NY 10036-6524
                                        (Tel.) 212-714-3078
                                        (Fax) 212-631-1250
                                        portere@whiteandwilliams.com

OF COUNSEL:
Thomas B. Fiddler
(*pro hac vice admission pending*)
WHITE AND WILLIAMS LLP
1650 Market Street, Suite 1800
Philadelphia, PA 19103-7395
(Tel.) 215-864-7000
(Fax)  215-789-7564
fiddlert@whiteandwilliams.com

Attorneys for Plaintiff
Ronald Boschan

-24-